Case No. 11-1479 at L. United Airlines, Inc. at L. Petitioners v. Federal Energy Regulatory Commission at L. Mr. Eastman for Shipper Petitioners, Mr. Caldwell for Petitioner SFPPLP, Mr. Fulton and Ms. Lufting, both respondents for the FERC. Good morning. Judge Griffith will consider these cases based on the audio recording of the oral argument. You can proceed. May it please the Court, I would assume that you would like me to address the jurisdictional issue that you raised in the order of about a week ago. Your Honor, I think that the missing piece of the jurisdictional puzzle is the DOE Organization Act, specifically Provision 42 U.S.C. 7192, which, much like the more general provision, saving provision, whereby in the DOE Act the authority of the ICC over oil pipelines was transferred to FERC, so, too, in the provision that I cited, the judicial review provisions as then existed over ICC orders was preserved and made applicable to orders thereafter issued by FERC. And I would cite to the Court two instances in the Court's orders where, indeed, that provision was relied on for this missing piece. Before that, could you tell us what the wording of that provision is that covers this? I'm sorry? Could you tell us what the wording of the statute is? Would you quote the applicable language? It says in 7192A that judicial review of agency action taken under any law, the function of which are vested by law in or transferred or delegated to the secretary of the commission, which would be the FERC, or any officer, employee, or component of the department shall notwithstanding such vesting, transfer, or delegation be made in the manner specified in or for such law. And so the judicial review, as it existed over an ICC order, now is the same procedure and process, same venue under the Hobbs Act, and I believe under Section 1710 of the Interstate Commerce Act gives this Court jurisdiction over the FERC order, much as you had jurisdiction over orders back in before 1976 over ICC orders. And there are two cases of the Court, the Mark West case, which can be found at, I'm sorry, Earth Resources v. FERC, 628 Fed 2nd, 234, which is a 1980 decision, and a second decision, AOPL v. FERC, which I believe is found at 83 Fed 3rd, 1424 at note 14, that's the Court's decision of 1996. And I would note that Judge Griffith was sitting in that panel, and specifically, it's interesting, in the footnote I just referenced, cites to the very provision I'm citing, and interestingly, in the citation, he points to the 1976 version of that, which is how it existed at the time of transfer. And I would just add, please don't be confused by the fact that the current Hobbs Act speaks in terms of the Surface Transportation Board orders. In 1995, the Congress amended the applicable provisions of the Hobbs Act to change ICC to STB. There was no substantive intent to vacate anybody's jurisdiction at that time. And, in fact, in the AOPL case... We need a little more than your H.C. Dixon to do it, no substantive intent. Well, I think there's two ways... We usually go by what Congress says in the Act. Yes, sir, I agree. There are two reasons, I think, that that's the proper reading of the decision, and that, or of the statute. And, first of all, it is a savings provision. It's a snapshot in time, much like the ICA, as it existed at the time of the transfer to FERC. That statute continues to exist in that archaic form, if you will, just as it existed at the time of 1976. That's so, I believe, that as the judicial review provisions existed at that time are preserved forevermore until Congress substantively changes that as they were written. Another way of looking at it is changing the name from ICC to STB in 1995 has no substantive effect. In fact, STB is simply the successor to the ICC, and I think it's reasonably read as not substantively changing the court's jurisdiction over ICC orders. It's simply a reflection of the fact that ICC doesn't exist. The Hobbs Act currently applies to cases from the STB. This clarifies that the Hobbs Act applies to those orders, but in no way changes the fact that in a snapshot in time in 1976, the court's jurisdiction was preserved by the DOE Act. Okay. You want to address the merits? Thank you, Your Honor. Your Honor, or may it please the court, I believe that the essential critical fact that is central to your decision here has to do with who pays the taxes on income derived by a partnership pipeline that's regulated by FERPA. And why do I say that's so centrally important? There's no dispute that if investors pay a tax under the discounted cash flow methodology for determining rate of return, it is necessarily incorporated in that return, which is a pre-investor tax return, that that's large enough to cover the investor's taxes. In contrast, if the tax is borne by the pipeline, much like the corporation bears a tax, the rate of return on equity derived under the DCF method does not include that, and therefore that's why you need an income tax allowance. So how would we remedy this if you were correct? If I am correct, is that you direct the commission to address and to remedy the double recovery. Is that consistent with our precedent in ExxonMobil? Right. So that's what I was going to ask, and I'll just add one thing. Go ahead. Add one thing to that was, isn't one of the two ways to correct it precluded by ExxonMobil? But answer Judge Chantel's question first. I don't think so, but I apologize. I didn't hear you, Judge Chantel. I asked if what you were asking for wasn't inconsistent with ExxonMobil. I don't think so. I think that ExxonMobil addressed the question, and it's derivative. Remember the orders on review in ExxonMobil were, in fact, the orders that FERC came up with on remand from BP West. So the focal point of the debate was, well, these taxes are borne by the investors, the partners, and not by the pipeline. How can you put it in a pipeline cost of service? And in BP West, the court suggested, much like FERC had said, that would be like having a fictitious tax being recovered. FERC comes back in the policy statement and says, well, it's true that the pipe— You're not getting far on distinguishing your case today from the ExxonMobil case. You're giving us a nice discussion of the background. What is it that keeps this from being inconsistent, your request for being inconsistent with ExxonMobil? Because I don't think the issue of double recovery was resolved in ExxonMobil. ExxonMobil never addressed the question whether, OK, if it may be included in the cost of service, all the court said was it can be included once. The issue we're bringing forward— But it said the income tax allowance was OK. They said the income tax allowance was OK on the assumption that there was no other recovery of— Well, it didn't say on the assumption, right? It just said the income tax allowance was OK. And that's why I was asking, is there another way for you to, if you're correct about the double taxation, just as the premise, is there another way for you to prevail other than the income tax allowance? And I noticed in the brief there's talk about designing a mechanism to eliminate it from the ROE. Well, that is— How would that work? Is that possible? Yes, it is. OK. But I think it's more complicated. Right. We say that it's recovered twice, once in the income tax allowance, once in the rate of return. If the income tax allowance is easy, you just eliminate it. If, however, you say, no, you've got to have an income tax allowance— Because we've already said that's OK. Because that's one reading of ExxonMobil, that it necessarily has to be there regardless of the double recovery problem, then let's look at the ROE. And in the ROE, since it's a pre-investor tax ROE, let's figure out a way of taking out of the ROE the component of the income tax recovery, and then we'll have no double recovery. I would suggest that either of those remedies on remand is available to the Commission. I would also suggest that the far more straightforward remedy— to the problem of double recovery—is that the rate of return is sort of an elegant, market-based solution to the question, how much tax are the partners actually incurring? The marketplace is a dynamic system, and the DCF tries to capture that by looking at actual market data. If we were not bound by precedent, would you be—if we were not bound by court, would you be up here asking us to simply overrule, say we were wrong in ExxonMobil? Your Honor, I believe that you need to distinguish ExxonMobil. You don't have to overturn it. Much like in ExxonMobil, you distinguish BP West. You've said to us— Right, you think ExxonMobil is inconsistent with BP West, at least at the time. We did, and we argue BP West is telling FERC that it's a fictitious tax, it can't be in the cost of service. And you disagreed and said all we said in BP West is that FERC may decide not to include an income tax allowance, but we didn't say they couldn't. Right. So that was a line of distinguishment. At the time, we considered both options, and it chose this option, and we said that was okay in ExxonMobil. And the language we used in ExxonMobil was grudging because of the deference we give on rate-setting, rate-making cases. Your Honor, I mean, to get—maybe skipping down the logic train of this, I think the Court understands my argument regarding the double recovery, and it appears you're concerned about having to reverse yourself. And I'm trying to say that— Well, we can't reverse ourselves. You can't reverse yourself? That's where we start, the problem we start with. But I believe that it is not a reversal for the reason I tried to share. But in addition, even if you want to go to the position of, gee, our hands are tied, they still have issued—they took our arguments regarding double recovery, and they revisited the question. The orders here on review are a substantive decision by the agency that is here subject to your scrutiny as whether it makes sense. In our view, this order is independently reviewable on its own merits because they reopen the question based on our argument. Commission, we think you've gone wrong. You're resulting in unjust and unreasonable rates by permitting a double recovery. What does FERC answer? FERC says, no, there's no double recovery. We've mathematically proven it. I mean, it's well over 100 paragraphs of dense, substantive discussion. Charts, 12 new commission-related charts, an appendix that comes up with a new theory about gross-up that simply takes the income tax allowance and say, no, it's not there. I've just taken it out. See, it's not there. That's this gross-up idea that they implement. And all of those decisions, all are premised on one factual error. All of those charts, all of the discussion, all of the tables are based on the premise that this tax should be treated as a pipeline-level tax. But they get that, of course. They get it's not actually a tax on the pipeline. So it's not that they don't understand. It's not like they don't understand. They don't seem to understand perhaps the difference in the corporate and the partnership structure. That may be where we went wrong in affirming them in ExxonMobil, but we did do it. But what they said is notwithstanding the fact that it's the partner who pays it and notwithstanding the fact that our own admission in paragraph 244 of 511 says investor taxes are recovered in the ROEs. So they're in the ROE. Nonetheless, we're going to persist in giving it to them again in the income tax allowance. And they say, well, it's really double taxation for the corporate shareholders rather than double recovery, and that's a feature of the tax code. That's one of their responses, which is, yeah, the partners are getting a break here relative to the corporate shareholders. At least that's one way to read it. But it's all within the bounds of reasonableness here. It's not within the bounds of reasonableness because the fact that the partnership has less of a tax burden. Remember, these are cost-based rates. Taxes are, as the courts have repeatedly said, just like any other cost. Now the partnership pipeline has gotten a break. They have less costs. That means their cost of service should go down. That should be good news because that makes them more competitive. They should be able to charge lower rates. So all the benefits, as the BP West Court observed, all the benefits of this tax break, of the tax provision, was captured once the partnership enjoyed the benefits of the tax reduction. They didn't say a word that FERC should do anything at that point. What FERC has done is go beyond the benefits of a lower cost of service, which should make them less risky and more competitive, even if it was an unregulated market. And instead they're going to say we're going to add on an additional benefit. And may I add at that point, remember the policy statement which you affirmed in ExxonMobil was premised your decision on the fact that their goal was to reach parity. You will not find in 511 and 511A that parity notion. In fact, I cited in my brief, the commission specifically says that if we don't give an income tax allowance, there will be parity to the after-tax returns of the partnership and the corporation. Now the commission has fundamentally changed the goals and the justification for their policy. And that's why this is a reopening that you should review on its own merits. Now they say, no, we want to do more than parity. We want to give the partnership an advantage. That's a completely different justification. And another reason why I don't think you have to reverse yourself in ExxonMobil. You affirm them on the basis that they were saying we need parity. And the court said, well, that seems reasonable to us. That's a nice goal. In fact, it's consistent with HOPE Natural Gas. But that's exactly what HOPE wants. Pipelines of comparable risk should get the same after-tax return. But the commission has now changed their tune. They said, no, that's not enough. We want to give them an advantage. I think that gives this court all the grounds it can to distinguish ExxonMobil. Say to the commission, you've come up with new reasoning. You basically have a new policy. You have new rationales for that policy. You have a new factual predicate for your policy. And we can review it. If we were to say it's wrong to give them an advantage, it's wrong to give them an advantage because? It's wrong to give them the advantage because, as you said in ExxonMobil, the goal under HOPE Natural Gas is that there should be parity. So it all stems from HOPE putting the outer bounds on what they can do in terms of favoring one type over the other. That's right. And that's what you were trying to do is make sure that one wasn't favored. In that context, you didn't want to favor the corporation. Well, it's more that we were allowing the commission to do it, rather. And as we said, even then, I think our opinion says, well, not without force on the phantom taxation issue and things like that. So we were clearly speaking the language of deference in that opinion. And basically what we now have given you is a reason why this policy, as now fundamentally altered by the commission  They haven't changed the policy. They may have changed their rhetoric, but the policy hasn't been changed from the one we affirmed in ExxonMobil. But that's not the test on whether they've reopened the issue and made their new orders subject to your review. I think that that's... So in sum, in HOPE Natural Gas, a pipeline is entitled to reasonable costs plus a reasonable return. I submit to you that it's absolutely arbitrary and capricious for the pipeline to come in and permit... for a commission to permit a pipeline to recover more than their actual cost by double-recovering a component simply based on a factual... on an error of fact. It is not a pipeline-level tax. It is an investor-level tax. One follow-up. Is parity not just permissible but required? I think under HOPE it's required. It all stems from HOPE, then? Anything else in the statute or case law other than HOPE that you say demands parity as opposed to allows parity? Because HOPE is at the heart of this as is Just and Reasonable. Just and Reasonable and HOPE all say you're allowed your costs. There is no precedent that I know of in the court or at the commission that has ever permitted and found Just and Reasonable a rate based on a double recovery of any cost component. We cited those orders to you in our brief. That's true under the Federal Power Act, the Natural Gas Act, and the Interstate Commerce Act. That's the heart of this case. Their whole case is based on an erroneous premise. When you change that premise and apply the correct fact that this is an investor tax, you find that Exxon Mobil's decision does not limit this court. They've come up with a new rationale, they've reopened the issue, and you can judge this decision without the concern that you're overturning yourself. Okay. Thank you very much. Thank you. Good morning. May it please the Court, I'm Charles Caldwell here on behalf of SFPP to address two other issues. SFPP seeks review with regard to the 2009 index and the rate of return on equity. First, with regard to indexing, the rates here, just some background, the rates here were set as of August 1, 2008. And in practice, those rates were then indexed forward to determine just and reasonable rates in future periods. But in this instance, the Commission only permitted SFPP to apply one-quarter of the 2009 index to those 2008 rates. It did that on the theory that the 2009 index is actually a backward-looking adjustment. It looks back to see whether or not the 2008 rates have 2008. The unexceptional observation, the 2008 rates have 2008 costs, as opposed to the index for 2009 being a forward-looking adjustment, saying let's take those 2008 rates and say, well, what inflation can we anticipate in the 2009 index year? And I'll just clarify something in case it's not perfectly clear because it's something I trip up on. When I say the 2009 index year, Your Honors, that actually starts off calendar. It starts July 1 of 2009 and goes all the way to June 30 of 2010. So with that premise, these are forward-looking adjustments. And for the support for that, you can look at the Commission's own indexing regulations. At 342.3d5, it addresses these exact circumstances. Where the pipeline comes in, it files a rate. That changes the ceiling, the rate ceiling for that index year. In this case, that was in 2008. When the Commission comes back and issues an order as to that rate, and in this case lowers it, and that's what the regulation precisely says, it changes the ceiling level in that year, in the 2008 index year, and then the regulations require that that becomes the base for the next year's index adjustment. And in this case, that's 2009. That's what the regulations provide. And, in fact, this Court's seen all of this before. In the BP West Coast opinion, we all live in that world. We can't get away from SFBP. In the BP West Coast case, it was the Opinion 435 series of orders, and that's where this indexing forward arose. The Commission came up with it as a way of determining just and reasonable rates forward in time. Because time passes. The regulatory process takes time. So in that situation, here's what the facts were. Because I'll suggest, I'll submit, that if the rulings in the 435 orders affirmed by this Court in BP West Coast were applied in this case, there would be a full 2009 index, and here's why. If you look back at BP West Coast, here were the facts. There was a 1993 base period that SFBP had, and then that was adjusted forward to 1994 for 1994 costs. And then that 1994 rate was then indexed into 1995 and subsequent years to determine just and reasonable rates, reparations, and refunds. Well, let's move forward to today. In this case, what you had was a 2007 base period adjusted partially for 2008 costs, and then taking that 2008 rate and indexing it into 2009, applying the 2009 index and so forth. Same process. Difference is only one quarter of that 2009 index was applied. On this theory that you're supposed to be looking backwards, well, that never happened in the 435 orders, or was that explained that that would be the case to this Court in BP West Coast? The commission attempts to... Yes, Your Honor. Does the BP order on this issue compel what you're asking for or simply permit? It permits it, Your Honor. It permits it. I would say it's a matter of consistency because I will acknowledge, Your Honor, that there are other orders that the commission can and does cite, but, Your Honor, twice wrong doesn't make right, three times wrong doesn't make right, and so forth. There are orders where the commission's gone off in a different direction and turned indexing around to look backwards. SFBP submits that's inconsistent with the commission's original formulation of indexing forward, and it also doesn't make good sense. The way they try and distinguish themselves to try and get away from the 435 orders is they say, well, that was a complaint case. This is a case where the carrier came in and filed a rate, and there were protests. That's a, Your Honor, under the statute, that's a distinction without a difference. There's two provisions of the Interstate Commerce Act. A complaint would arise under Section 13, Paragraph 1. The protest of the carrier rate would arise under Section 15, Paragraph 7. But in both instances, the commission has to determine what the just and reasonable rate is, whether a complaint or protest, and then it now indexes those forward in time. So whatever setting you're in, you end up at Section 15, Paragraph 1, which is the commission's authority in either setting, this setting or a complaint setting, to determine what the just and reasonable rate is forward in time, and that's what they use indexing forward for. So the distinction the commission uses to try and get away from its prior precedent, and this court's order in BP West simply doesn't apply. It's not a real distinction. And the other difficulty with what the commission has done here is they've ignored their test. They have it right there in their eggs in 343.2c1, we reference in our briefs, sets forth a comparison, and the comparison would be you look here, you would look at the change in cost from 2007 to 2008 and compare that to the 2009 percentage, whether it's substantially in excess of the actual cost change, whether to apply it or not. That was never applied in this case. The commission on brief notes, page 47 and 49 of their brief, they assert that the shippers raised in their protest 343.2c1. I would submit, Your Honor, you can go through the reference portions of 511 and 511A, and it's not in there. There was no reference in the protest, there's no reference anywhere in these orders to actually applying what the commission calls the percentage comparison test. They stake everything on their theory of looking backwards and saying were the costs recovered in the past as to whether or not we make a future adjustment that's a prediction of future costs. They're confusing the test with the purpose of indexing. If I can move on to, unless there are questions, I'll move on to equity return. Thank you. Okay, with regard to equity return, there's not in dispute here that the commission's standard practice is to look to the freshest, the most recent ROE data. So there's no dispute there. In this case, that data was vintage April 2009. That was the freshest data in the record. The commission said let's not look to that because that was affected by anomalous economic conditions. We all remember the Great Recession. Why is that unreasonable for them to say that? It's not unreasonable, Your Honor, I'm not at this point focusing on that. I would say the commission has a policy. It has the advantage of being objective, but it can choose to evaluate and say, well, let's use something else, and that's what they did here. The point is that in doing that, they said, well, the April 2009 data is unrepresentative. But then they turned around and said, well, let's use September 2008 data, and they made no such analysis. They made no such analysis. So their point is that they said let's use September without saying why that data was representative. That's right, Your Honor. There is a standard there of representativeness. You can search around. I've done it. You look down to the ALJ's analysis, the ALJ said nothing about whether the September 2008 data was representative. He rejected the April 2009 data. Let's move forward to the opinions. The only point... Your objection is not to the rejection of April, which they did justify by the anomalous condition. Your objection is to the acceptance of September, which they did not justify. Well, Your Honor, we would deeply prefer for the commission to have picked April 2009. I'm not conceding, Your Honor. But I'm trying to focus on the commission's position. As far as where you assert there is error, the error is in the lack of foundation for the September choice rather than for the April launch. That's right, Your Honor. That's right, Your Honor. And if you look, let's look at that earlier September 2008 data. What the commission did was the real return on equity was 7.69%, and I realize I'm going to keep going like that. Okay, sorry. It was 7.69%, and that was driven downward by an anomalously high inflation factor back then in September 2008 of 4.94%. Okay. What the commission did was they picked an inflation factor out of a brief period of peak inflation out of a stretch of 20 years of lower inflation, data that SFPP put into the record. On the basis of that, they ended up with this low 7.69%. Well, then what did they do next? They went and reached out to a different SFPP case, different record, and they plucked two real rate of return percentages, 8.72% and 9.09%. Oh, now let me say, there's no analysis of those numbers. They're just put in a chart on a page in the opinion. The submission suggestion is made, oh, well, therefore the 7.69% is not a big deal. Well, I would submit, Your Honor, it is in technical language a big deal because that's 100 basis point difference or 140 basis point difference. Out in the real world, that's real money. I can run you through an example. The compliance filings are in the record. They're record item 1016. If you look on statements C and D, they will show you that that's real money. Even the narrowest difference there could translate into over a million dollars in change in the cost of service. Those were significant differences, and the commission used those to try and make 7.69% look better. All it does is emphasize that there's no real evaluation supporting this outcome in this proceeding. The commission falls back on an argument that we're looking at a more fundamental principle of rate making, that the cost of service is supposed to be a reasonable forecast of the future. Okay, well, that's fine, but there's no evidence here that they evaluated the September 2008 data to find it to be a reasonable forecast. And on the basis of that non-evaluation, what they've done is saddled SFPP with a real rate of return on equity that was driven down by an anomalously high inflation factor. On that basis, Your Honor, we would submit, and in both instances, the commission's acted without reasoned decision-making. And it should be vacated and remanded so they can address these matters and address the record that SFPP attempted to make below. Okay. Thank you. Thank you, Your Honor. Your Honors, may it please the Court, Ross Fulton here on behalf of the commission, along with my colleague, Lisa Luftig. I will be addressing the jurisdictional issues as well as the shipper's petition for review, and Ms. Luftig will address the pipeline's petition for review. Your Honors, the commission agrees with the petitioners that this Court has direct appellate jurisdiction under the Hobbs Act, pursuant to the Department of Energy Reorganization Act. Hopefully I won't repeat too much of what was already said. Is there anything you want to add specifically or different from what was said? Just, Your Honor, I think a couple of quick points. As the shipper's petitioner said, the Savings Act 427192A transferred the jurisdiction that existed over the substantive law. This Court in Shell Oil, which is 47F3rd at 1194, held that that savings provision should be interpreted to provide the same jurisdiction that existed for the substantive law that was transferred. For that basis, as this Court held in the Earth Resources case that was already cited, this Court has the same jurisdiction over commission oil rate-making decisions as it had over those that were issued by the ICC. The one other thing I would like to add regarding the 1995 ICC Termination Act and its lack of effect on jurisdiction, as my colleague already mentioned, this Act, if you look at the actual Section 305A, which actually amended the relevant provisions of the Hobbs Act, all it did was simply insert the Surface Transportation Board for the ICC. And as this Court held in All-in-Back v. FHWA, which was F3rd 156, that case dealt with an alias transferred authority from the ICC to the Department of Transportation, and the challenge was whether those decisions were still subject to direct jurisdiction. This Court found that the savings provision at issue there was still applicable. This Court still had direct jurisdiction because— Just to be clear now, that's before the 1995 or the change in the Hobbs Act, if you're talking about that, right? Well, the decision was issued in 1997, Your Honor, and at issue was whether anything had changed, or whether, I should say, whether changes to the Hobbs Act altered jurisdiction. And this Court found there was no alteration because there was no indication that Congress intended a contrary result other than for the savings statute to apply. And all-in-box reasoning should apply equally here. And, in fact, in another case cited by petitioners, the Association of Oil Pipelines v. FERC, this Court applied the savings statute after that 1995 ICC Termination Act. Turning to the merits here, Your Honors, the Commission here allowed the pipeline operating as a partnership to take an income tax allowance based on the ExxonMobil decision, which also upheld a tax allowance for a pipeline partnership as reasonable. Is there double recovery or none? There's not double recovery, Your Honor. Why not? Two reasons. The Commission found that the discount model did not, in fact, recover the taxes as claimed. The Commission extensively considered and rejected the shippers' arguments that the tax was captured by the discount model. For example, in paragraphs 324, 325J, 886, 887, the Commission explicitly looked at that issue and rejected it. The Commission instead found that the discount model informs of what the rate of return need, but it does not actually provide the revenue or returns necessary. That's done with the rate methodology. And the Commission distinguished the two and explained because the rate methodology is not grossed up to include income taxes, those will not be recovered absent an income tax allowance. I also wanted to point out that the shippers make much of this argument that this results in an advantage to the partnership relative to a corporation, which is different than the reasoning in ExxonMobil. But as the Commission actually talked about in its order, for instance, at paragraph 317J, 881, 882, it actually does not. What happens, it results in a commensurate return to both the partnership and the corporation to allow both to have an income tax allowance consistent with HOPE National. At risk of oversimplifying, in the real world, corporations have an extra layer of taxes. That's correct, Your Honor. And partnerships do not have. Yes. So, in fact, is it not, as the shippers suggest, the situation that you are creating a fictitious tax that you're giving them credit for would result in effectively double credit? It will not, Your Honor, because to take it outside the Commission context for a minute, because of the tax code, as we discussed, partners will have a higher return after tax take-home. Or I should not say return. I should say they will have a higher after tax take-home than corporate shareholders will have. But because of that, partners pay a higher amount for their shares of a partnership than corporate shareholders do. So, in a competitive market, the actual returns are going to be the same because those partners are paying more for their shares. So, as the Commission discussed, and, in fact, part of why on page 952 of ExxonMobil, part of the reason this court upheld as reasonable the Commission's determination there is because the Commission found that absent a tax loss for both, the partners would have lower returns than corporate shareholders because they would have the same take-home, perhaps, but they would have paid more for their actual shares. So, to ensure parity and commensurate returns, a tax loss for both is actually necessary. And to take back a step, as was discussed. It seems like the tail wagging the dog there in terms of how you're addressing that. Okay, the market, because of how we do this, the market adjusts, but does that make how you do it correct in the first place? I understand your point, Your Honor. I guess the question is whether the Commission should alter the tax code. No, no, it's whether it should recognize the tax code. I guess what I'm trying to say is the tax code results in higher after take-home to partners. The tax code results in a different tax structure. That's correct, Your Honor. It doesn't result in one more layer of taxation for corporations than there is for partnerships. That's the way it is. Yes. Nobody's going to alter that. That's the way it is. Yes, so the tax code results in a higher… And then you're saying because the market reflects the difference, we should treat that as causing you to need to make another adjustment. No, we're saying that we don't want to make further adjustments. We want to let the tax code function as it does. So outside the… But you don't because of the way you give the income tax allowance to the partnership, even though the partnership doesn't pay the income tax. Yes. So you're not just taking the tax code as it lies. Well, I think what the commission found and what this court upheld in ExxonMobil is that for purposes of commission rate-making, partner taxes, even though they're paid by the partners, are operating-level taxes because they're a real—the court's language, I believe, is a real if indirect cost to the partnership when it's raising capital. So, again, the shipper's arguments ultimately focus on a disagreement with ExxonMobil, which is that they want to say that these are investor-level taxes, which is—we can all agree these are literally investor-level taxes. Leave the word literally out and the statement's equally true. But to say they're investor-level taxes is to ignore what the court held in ExxonMobil, which is that these are operating-level costs for the partnership. And to maintain parity between the corporation and the partnership, they are both entitled to a tax allowance, which this court upheld as reasonable. There's another way to remedy it, I think, which is to design a mechanism to eliminate it from the ROE. Or is there not? I assume that's correct, Your Honor. Your Honor, the commission obviously hasn't addressed it. I think, though, the bigger point is that the commission found that it's already—it's not captured by the return on equity. Did the petitioners raise the possibility that it could be addressed? They did, Your Honor. Obviously, as I said, the commission has not addressed it. But the commission has found that the return on equity does not capture those taxes. The commission, again, considered that argument. In fact, in ExxonMobil, as was pointed out in the briefs, this was in the air, but we were told, don't worry about that, that will be dealt with separately. I think there's a couple problems with that argument that was brought up. I should know for the first time. It seems like a bait-and-switch a little bit. Well, I'm not so sure, Your Honor, because looking at the language from the commission brief, which was cited for the first time on reply, this was not raised. Don't worry about that. It's a public record. I think the commission says that it is addressing the issue. It does not say that the court should not consider it, but the commission has— That's pretty thin. That's fair. What else do you have? I'm going to turn my bag of tricks out. Excuse me. The commission has taken a consistent position. My point being that ExxonMobil doesn't necessarily resolve everything that's been presented here because one of the things that was in the background, I suppose, at the time of ExxonMobil, was this issue that's now being raised of the double recovery. And we said, okay, it's okay for the income tax allowance to the extent there's an issue. We didn't say this explicitly, but from the briefing, obviously implicitly, that can be dealt with down the road. Well, here we are down the road, and now we're being told, oh, no, ExxonMobil will resolve that. Well, I think what the commission is saying is that ExxonMobil— it's consistent with ExxonMobil to allow an operating-level tax allowance. But as the shippers pointed out, Your Honor, the commission goes into extensive detail with tables, charts, paragraphs, as to why the discount model, contrary to what the shippers claim, does not actually capture this tax relief. So, for instance, if you look at Table 2 in the rehearing order on JA58, which is very similar to what's cited in ExxonMobil with the same type of figures. Keep going, sorry. No, the charts consistently show that without an income tax allowance, the partnership is not going to recover its return on equity and its tax costs without a tax allowance. Because, as we discussed earlier, the commission fully agrees that a partnership is going to have a higher after-tax take-home than a corporation. And, again, that's just a result of how the tax code functions. What about HOPE? HOPE is cited as the precedent that says parity is not just permissible, but is required that you're just acknowledging there that there's not parity. Well, again, I think that there is parity because those partners, again, if they have a $100 return versus a $50 return for a shareholder, but they paid $10 for their share as opposed to the $5 the shareholders pay, ultimately they have the same return. It's just that, again, is a function of how the tax code works. So, if that seems to be chasing its tail, would it not be equally true that if you change the way you're treating it, that could have the effect of changing the market value of shares back in the other direction? And the commission— All you're really saying is price is going to reflect what we're doing here. You're correct. It will. That would seem to justify anything you wanted to do. The market will respond, Your Honor. That is correct. It will harm, as ExxonMobil found, it will harm the—or I should say upheld the commission's finding. It will harm people that have currently bought shares who assumed that they would have a higher after-tax take-home in a partnership than a corporation. But, yes, down the road, the market will adjust. And, in fact, the commission showed in the order that when the income tax allowance was taken away, the price for partnership shares dropped. But the commission found that as evidence that the taxes are not recovered without the tax allowance because it clearly was not baked in, so to speak, to the return on equity. So is your primary argument here that there is not, in fact, double recovery? Yes. The commission did not find double recovery. As I said, the commission goes into great detail, such as in paragraphs 290 to 296, JA59-862, that the discount model does not recover. And, in fact, the shippers cite no evidence to the contrary. The shippers don't offer any empirical evidence that there is a double recovery or that taxes are somehow recovering the discount model. They also respond with theoretical arguments. But, ultimately, the commission is entrusted with determining whether the discount model or any other method could recover the taxes other than a tax allowance. And so, in sum, the commission, the same bases that were played at ExxonMobil are applicable here. And to the extent that this argument was not already covered or addressed in ExxonMobil, the commission found that there is no double recovery and that the discount method does not recover the tax burden. Thank you. Good morning, Your Honors. May it please the Court, Lisa Loftig for FERC. I will first address the indexing issue, which I just want to say this notion that this is a forward-looking adjustment is a bit of a distraction. I think the clearest statement about the index is at JA 929. The commission says the indexing methodology is to account for industry-wide cost changes during the prior year. So the commission always uses actual producer price index for finished goods, what actually occurred to figure out what the index is, and that gets applied forward for future rates, but it's based on actuals. And so I also want to address that BP West Coast, as was raised, as you noted, Judge Sentelle, it does not compel a different outcome than the commission's orders here. The issue was never raised in BP West Coast, and the challenge wasn't made that these costs, the year after, or the index the year after a cost of service would be so substantially in excess of the actual cost of service. The commission did apply its regulations here and found that it would be inequitable to allow the full index for this year and allowed one quarter, which was based on reasoned decision-making in the orders. And I'll note in note 687 of 511A, the commission explains, which is on JA 934, the commission explains that although it didn't apply the percentage comparison test here, the commission still applies the percentage comparison test. It just sees no reason to do so where there's record evidence to show why the index wouldn't be appropriate under these circumstances. And this is fully consistent with its precedent. It cites two orders. One case, their regular order and a rehearing order involving SFPP where the commission denied an index in the year after a cost of service study. If there are no questions on indexing, I can move on to the ROE. The commission did have substantial evidence in the record for its findings. I will just... For which finding? For its findings that the September 2008 real ROE is an appropriate ROE for SFPP going forward. What's the best place in the JA or the record? Well, in 511... Where the... JA 486... Excuse me a moment. Oh, sorry. Where the commission says why September 11 is a proper period. Okay. Why September is a proper period. Well, in 511, at JA 485 to 486, the commission explains its reasoning for rejecting the later update. And it says that updating the record, this is JA 486, is subject to the more fundamental principle that the cost of service be a reasonable forecast. So it's saying what its standard is. And then in 209, it says financial information that SFPP included shows that the updated data is not representative. And then it looks at the... It does a comparison of different real... Not using April. I'm not sure we're justified using September instead. Well, the commission is comparing real ROEs, which is the nominal less inflation. And it has record evidence here showing... There may be evidence. There may be evidence in all kinds of directions. Where does the commission best tell us what its reasoning is for using September? I think the best sentence is in paragraph 209, where it says that the record evidence includes 7.20% for 2008 as updated to 7.64% for September 2008. And you have to look at the testimony that these decisions were based on. SFPP's own witness at the time it submitted this information never said that there was an anomaly in the 4.94% inflation rate. There is... I mean, at the time... And you should judge data by at the time it was submitted. That's the Indiana and Michigan Municipal Distributors Association case. And in fact, if you look at JA-29 through JA-35, this is a list of consumer price index inflation rates dating back to 1983. And SFPP is selective in the data it chooses, and it chose 1992 forward. This exhibit shows inflation rates much higher than 4.94 for the late 80s and early 90s. So there was record evidence to support the 7.69% real ROE, and the commission justified its reasoning for why it selected that by stating what its standard is, looking at comparison of data, and then selecting that data. And in fact, it also rejected... The commission has to rely on record evidence. It's basic. And the commission also, in paragraph 259 of 511A, it also rejected SFPP's proposal to do an averaging, saying, well, if we were to do that, it would result in an artificially inflated return. And you can't adjust one input to the cost of service without making corresponding inputs that might lower it. So do you have any further questions? Okay, thank you. Thank you very much. A few minutes for rebuttal. Thank you. I'd like to just address two points that the commission made because they're really central here. The council said that the commission said that this tax, in fact, is not in the DCF ROE, and he cited several paragraphs. And I just want to emphasize to you that those paragraphs, like all of their tables and appendices and charts and examples, all are premised on calling that a pipeline-level tax. They're saying much like a corporate tax. The corporate tax is not recovered in the DCF ROE. You don't gross up the ROE, not only to get the investor-level tax, but then you don't turn around and say, oh, and now we have to pump the ROE up again for the corporate-level tax. No, as I said in my opening remarks, that's taken care of in an income tax allowance because it's not in the ROE. All that the commission has said is, number one, paragraph 244 of 511, if it's an investor tax, it's in the DCF ROE. And when they, in 511A, attempted to back away from that, that entire discussion is based on the assumption that it's a pipeline-level tax and it's not an investor tax. There, by definition, it's not in the DCF ROE. It's all circular reasoning. If you look carefully at paragraph 295 of 511A, and again in their discussion of their gross-up appendix in paragraph 327 of 511A, please read those carefully, and you will see that embedded in that is, again, this erroneous assumption. They're not saying that the DCF ROE doesn't collect all investor taxes. They're saying this tax is not in the DCF ROE because we're considering a pipeline-level tax. If you're a fan of Star Wars, it's like a Jedi mind trick. These are not the double recoveries that you're looking for. That's what's happening here. The second point is the market resets, to be sure. The more costs you put in the cost of service, if there's over-recoveries of any sort, whether it's a double recovery of a component or anything else, that helps the market share. The market share goes up, and therefore the rate of return ultimately resets to that particular number. The same would be true if you didn't allow the pipeline to collect their full cost of service. They would have under-recoveries. Their revenues would go down, their distributions and dividends would suffer, and the market price would go down. But once again, the share value goes down. We're back to the same ROE after tax. I guess what Hope is saying is it's the Goldilocks zone. Not too much. Don't over-recover. Yeah, you'll get your return at the end of the day, but you're going to over-recover your costs, and that hurts ratepayers. Not too little, because if we don't give you your full costs, there's not going to be enough revenues to distribute to the dividends or distributions, and that's going to affect the price because investors will now pay less for the share. But again, the rate of return resets. That's just part of the show game here. Of course the market resets it. The question, though, is is the cost of service too high? We say yes, because you're getting a double recovery. That's all I have unless you have further questions. All right. Thank you very much. A few minutes for a vote. I will be brief. Here, and I'll focus on the ROE. Here the commission had an established practice taking the freshest ROE data. They decided to step away from that. They needed to provide a reasoned basis for what they chose instead. There was a presumption in favor of one set of data. They said, okay, great recession, no, we're not going to use that, though this entire period was a period of turbulent economic, because prior to the Great Recession there was a bubble. So I can even remember that. So you have a situation where they've opted away, okay, so they had to provide reasoned decision making. I did not hear any citation to an actual evaluation. And to get real specific about it, Your Honor, if you'll indulge me, with regard to the real ROE, there was a citation to the SFPP witness, Professor Williamson, with regard to, oh, well, he presented the September 2008 data. Well, that was the test period presentation. It would have been odd for there not to be a presentation of the ROE in the case in chief for the test period. So that was in there. Nowhere in his testimony did he indicate that the September 2008 figures were, in fact, representative. They were presented because that was the vintage that was available at the time that supported the original filing. The commission's practice is to take the latest SOAP. In fact, Professor Williamson did two subsequent updates, the last of which was the April 2009 set of data. If the commission wants to cite to, well, there was other testimony in the record, I would submit that none of the other witnesses who addressed ROE ever said that the September 2008 data was representative, either the real ROE or the inflation. And I can cite you. I'll say it slowly for the transcript because I don't want you to have to rush writing it. But I would suggest, one, you can look at Professor Williamson. It's at JA51 and 67 to 68 and 82. And the other witnesses that you could look to would be JA16, 11, and 19 to 23. I submit that there's no indication there that any of the witnesses below did such an analysis of the representativeness of the September 2008 data. What was done was the update was the normal course of things. So nobody as to the initial test period submission would make that type of analysis. I would submit that there was no such analysis made by the commission, and it should be remanded so they could properly engage with the real record in light of the anomalous conditions affecting the September 2008 data. Unless there are questions, Your Honor. Thank you. Thank you to all the counsel. Well argued. The case is submitted.
judges: Griffith, Kavanaugh, Sentelle